Glen M. Diehl
Matthew P. Hintz
DIEHL SERVILLA LLC
77 Brant Avenue, Suite 210
Clark, NJ 07066
Telephone:  (732) 815-0404
Facsimile:   (732) 815-1330
gdiehl@dsiplaw.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG THORNER and VIRTUAL REALITY FEEDBACK CORPORATION,<br><br>　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>SONY COMPUTER ENTERTAINMENT AMERICA INC. and SONY COMPUTER ENTERTAINMENT INC.; GREGORY S. GEWIRTZ and LERNER DAVID LITTENBERG KRUMHOLZ & MENTLIK, LLP; PERFORMANCE DESIGNED PRODUCTS LLC; RILEY RUSSELL; LARRY C. RUSS, MARC A. FENSTER and RUSS AUGUST & KABAT, a PROFESSIONAL CORPORATION,<br><br>　　　　　　　　Defendants. | Civil Action No.<br>3:09−CV−01894−GEB−DEA<br><br>Hon. Garrett E. Brown, U.S.D.J.<br>Motion Day:  September 8, 2009 |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO SONY DEFENDANTS' MOTION TO DISQUALIFY GLEN M. DIEHL, ESQ. AND DIEHL SERVILLA**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES………………………………………………………......………..ii

INTRODUCTION………………………………………………………………………..…....…1

STATEMENT OF FACTS………………………………………………………………………..1

    A.    BACKGROUND………………………………………………………………….1

    B.    THORNER RETAINS DIEHL……………………………………………………4

    C.    THE PATENTS IN SUIT AND THE ACCUSED DEVICES……………………4

    D.    DIEHL'S WORK FOR SONY WHILE EMPLOYED BY LERNER DAVID…...5

ARGUMENT………………………………………………………………..……………………7

I.    DISQUALIFICATION UNDER R.P.C. 1.9(A) IS UNWARRANTED BECAUSE THE FACTS UNDERLYING THIS CASE AND DIEHL'S WORK FOR SONY ARE NOT RELATED…………………………………………...7

    A.    THE FACTS AND ISSUES IN THIS CASE…………………………………….8

    B.    DIEHL'S PROSECUTION WORK…………………………………………….9

    C.    THE LIGHTSTREAM PATENTS……………………………………………10

    D.    DIEHL NEVER DISCUSSED LITIGATION OR SETTLEMENT STRATEGY WITH RUSSELL IN CONNECTION WITH THE *OKOR* AND *HOEFER* MATTERS, OR OTHERWISE…………………….....12

    E.    CONCLUSION…………………………………………………………….....13

II.    R.P.C. 1.9(B) HAS NO APPLICATION HERE……………………………………...14

III.    R.P.C. 1.9(C) IS INAPPLICABLE AS WELL……………………………………….15

IV.    THE BALANCE OF HARDSHIP AND HARM WEIGHS AGAINST DISQUALIFICATION……………………………………………...15

CONCLUSION……………………………………………………………………………….16

# **TABLE OF AUTHORITIES**

Page

<u>CASES</u>

*Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099 (D.N.J. 1993)……................................8

*Bagdan v. Beck,* 140 F.R.D. 660 (D.N.J. 1991)…………………………………………………..7

*Carlyle Towers Condo. Ass'n v. Crossland Sav.*, *FSB,* 944 F. Supp.
  341, 345 (D.N.J. 1996)………………………………………………………………….7, 8

*Ciba-Geigy v. Alza Corp*, 795 F. Supp. 711 (D.N.J. 1992)………………………………….13, 14

*Home Care Indus. Inc. v. Murray,* 154 F. Supp. 2d
  861, 866 (D.N.J. 2001)………………………………………………………………...7, 15

*In re Gabapentin Patent Litig.*, 432 F. Supp. 2d 461, 464 (D.N.J. 2006)…………………….....15

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)
  (en banc), *aff'd*, 517 U.S. 370 (1996)……………………………………………………...8

*Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469 (1980)……………………………………………...7

*Rohm and Haas Co. v. American Cyanamid Co.*, 187 F. Supp. 2d
  221, 227 (D.N.J. 2001)………………………………………………………………7, 8, 9

<u>OTHER AUTHORITIES</u>

R.P.C. 1.9(a)…………………………………………………………………………………...7, 14

R.P.C. 1.9(b)……………………………………………………………………………………...14

R.P.C. 1.9c(c)…………………………………………………………………………………….15

**INTRODUCTION**

Plaintiffs Craig Thorner and Virtual Reality Feedback Corporation ("VRF") submit this memorandum in opposition to the motion of defendant Sony Computer Entertainment America Inc. and Sony Computer Entertainment Inc. (collectively "Sony") to disqualify Glen M. Diehl, Esq., and Diehl Servilla LLC (collectively "Diehl") as counsel for plaintiffs.

Put bluntly, Sony has utterly failed to carry its "heavy burden" of proving that a "patently clear relationship" exists between Diehl's work for Sony more than five years ago and the subject matter of this case. Indeed, an examination of the relevant facts demonstrates that no relationship exists between Diehl's earlier work for Sony and the facts of this case.

Hence, there is no likelihood that Diehl would exploit confidential information of Sony, even if he had any, in pressing plaintiffs' claims in this action. Sony's motion is nothing more than a baseless tactical ploy to eliminate plaintiffs by eliminating their attorney. It should be rejected, accordingly.

**STATEMENT OF FACTS**

**A.     Background**

As recounted in much greater detail in the Amended Complaint, the circumstances giving rise to this action date back to September 2004 when Immersion Corporation ("Immersion") obtained an $82 million judgment against Sony for infringement of patents relating to computer game sensation generators. (Hintz Decl. ¶ 2, Ex. 1, Verdict Sheet.) Several days later, Immersion commenced an action for infringement of the same patents against Electro Source LLC, now known as Performance Designed Products LLC ("PDP/Electro Source").

Sony and PDP/Electro Source were aware that plaintiff Thorner had developed computer game sensation generators and obtained patents covering his work in the 1990s that might invalidate Immersion's patents. As a result, Sony and PDP/Electro Source and their attorneys – including defendants Riley Russell and Gregory Gewirtz – conspired to employ fraud and deceit to induce Thorner to testify in support of Sony's motion for a new trial in the Immersion case, and, at the same time, obtain a license under Thorner's patents on "ridiculous[ly]" favorable terms for Sony and PDP/Electro Source. (Hintz Decl. ¶ 3, Ex. 2, Hearing Tr. at 35, lines 16-18.)

To that end, in May and June 2005, PDP/Electro Source's attorneys started negotiating a license with Thorner that, *inter alia*, called for PDP/Electro Source to make an initial payment of $150,000 to Thorner, but also granted Sony an option to become a party to the license agreement. (Thorner Decl. ¶ 2.) Sony's lawyers, defendants Russell and Gewirtz, falsely explained to Thorner that Sony could not enter into a license with Thorner or make any payment to Thorner while Sony was seeking a new trial in the Immersion case in order to prevent Immersion from attacking the credibility of Thorner's testimony. (*Id.* ¶ 3.)

In fact, unknown to Thorner, Sony secretly funded the $150,000 payment to Thorner. (*Id.* ¶ 4; Hintz Decl. ¶ 3, Ex. 2, Hearing Tr. at 38, lines 10-12.) Moreover, defendants Gewirtz and Lerner David undertook to represent Thorner and advised him to sign the license agreement with Electro Source on the grounds that it was a fair agreement and the best that could be expected. (Gewirtz and Lerner David First Am. Ans. ¶ 89; Thorner Decl. ¶ 5.)

During a hearing in November 2005 in connection with Sony's effort to gain a new trial in the Immersion case, defendant Gewirtz and another Lerner David lawyer described the PDP/Electro Source agreement as:

- a "windfall" for Sony. (Hintz Decl. ¶ 3, Ex. 2, Hearing Tr. at 42, lines 12-14.)

- "a huge win for lawyers to get for Sony this kind of option at this price. It's ridiculous." (*Id.* at 35, lines 16-18);

- "an insurance policy for half a percent" for Sony (*Id.* at 36, lines 14-15);

- "a great deal for Sony" (*Id.* at 38, line 5); and

- "one of the cheapest insurance policies – I'm doing this over 40 years – that I've ever seen or gotten for a client, in a sense." (*Id.* at 44, lines 7-9.)

In addition, during the hearing, defendant Gewirtz explained that Sony's option under the PDP/Electro Source license protected Sony's handheld controllers for its PlayStation video game products:

> THE COURT: What are the Sony products that were being protected under or would be protected under this Deal Point Memorandum [i.e., the PDP/Electro Source agreement]?
>
> MR. GEWIRTZ: Your Honor, the Sony's [sic] products were its hand-held controllers for the PlayStation video game.

(Hintz Decl., ¶ 3, Ex. 2, Hearing Tr. at 40, lines 15-20.)

Sony's motion for a new trial in the Immersion case was denied on March 8, 2006. Immersion then sued Thorner for cooperating with Sony and PDP/Electro Source on March 24, 2006. (Thorner Decl. ¶ 6.) On or about March 30, 2006, Thorner sent Gewirtz copies of Immersion's summons and complaint with the expectation that Gewirtz would honor a previous promise to represent Thorner in the event that Immersion sued him. Gewirtz refused with two simple words: "Good luck." (*Id.* ¶ 7.)

3

B.     **Thorner Retains Diehl**

Thorner contacted Diehl in January 2006, seeking representation in licensing his patents. (*Id.* ¶ 8.)  When Immersion sued Thorner, Gewirtz refused to represent Thorner against Immersion. (*Id.*)  Thorner contacted Diehl in March 2006 to see if Diehl would represent him. (*Id.*)  Diehl agreed, filed a counterclaim on Thorner's behalf, and, after concluding discovery in 2007, negotiated a settlement with Immersion. (*Id.*)

Before 2006, Diehl had never heard of Thorner or Immersion and had no knowledge of video game vibration technology. (Diehl Decl. ¶ 16.)  Similarly, he had no knowledge of Immersion's suit and judgment against Sony. (*Id.*)  Nor did Diehl know that Lerner David had represented Thorner in connection with the Electro Source agreement while simultaneously representing Sony to obtain a new trial in the Immersion case. (*Id.*)  Indeed, Diehl could not know of these matters, as he ceased his employment with Lerner David in June 2004. (*Id.*)

Diehl learned and developed the facts underlying this case in the course of representing Thorner against Immersion, and by obtaining and reviewing publicly available records, depositions and hearing transcripts related to Sony's motion for a new trial, and carefully considering Thorner's patents and Sony's infringing products. (*Id.* ¶ 17.)

C.     **The Patents in Suit And The Accused Devices**

Plaintiffs assert that Sony infringes United States Patents Nos. 5,684,722 (the "'722 patent") and 6,422,941 (the "'941 patent") through the sale of vibrating headphones and handheld controllers used with Sony's PlayStation products.  The '722 and '941 patents are attached as Exhibits B and C to the Kehoe Declaration.  Both patents cover *peripheral* tactile sensation generators that are plugged into a computer game system, such as Sony's PlayStation console system. (Kehoe Decl. ¶¶ 11-13 and 15-16.)  These generators produce vibrations and other

4

sensations that correspond to events playing out on the screen of a computer game, and greatly enhance the computer gaming experience.  (*Id*. ¶¶ 11 and 15.)

Briefly, the '722 patent discloses a circuit and related apparatus to convert an audio signal from a video game into a control signal that actuates a tactile sensation generator (i.e., a motor) that produces vibrations and other sensations in, for example, a seat, that correspond to events playing out on a video screen.  (Kehoe Decl. ¶ 15, Ex. C.)  The '941 patent is related to the '722 patent, but more broadly covers the use of any audio or control signal produced by a video game (as opposed to only an audio signal) and claims the use of two motors (i.e., "actuators") attached to a flexible pad to generate tactile sensations in a video game controller.  (*Id*. ¶¶ 10-11, Ex. B.)

The accused Sony headphones and handheld controllers are stand alone products. Plaintiffs make no claim against the PlayStation console which uses microprocessors and other electronic devices to run sophisticated software to produce the video game on a computer.  The structure and function of the sensation generators of the '722 patent and '941 patent and Sony's vibrating handheld controllers and headphones have nothing in common with the PlayStation console.  (Kehoe Decl. ¶¶ 7-9, 11 and 15.)[1]

D.  **Diehl's Work for Sony While Employed by Lerner David**

Diehl was employed by Lerner David for just over two and one-half years, from October 2001 to early June 2004.  (Diehl Decl. ¶ 4.)  During that time, he admittedly spent time contributing to the prosecution of various patent applications for Sony.  With one exception, the patents and patent applications Diehl worked on are publicly available and concern the design

---

[1] Indeed, the accused handheld controllers are the subject of U.S. Patent No. 6,001,014 (the "'014 patent"), as evidenced by the fact that this patent is listed on packaging for the Playstation system and packaging for the handheld controller when sold separately.  Plaintiffs' '941 patent antedates the '014 patent.  (Kehoe Decl., ¶¶ 33-34.)

and operation of the PlayStation console (Diehl Decl. ¶ 13.)[2] Similarly, the cover pages of manuals submitted with the Gewirtz Declaration all relate to the PlayStation console, not to headphones or handheld controllers. Diehl has no recollection of even referring to any of these manuals. (*Id.* ¶ 15.)

Diehl also drafted an opinion in regard to the "Lightstream patents" (U.S. Patent Nos. 5,947,825 and 5,674,127). (*Id.* ¶ 7.) The Lightstream patents describe and claim a distributed game entertainment system that includes a network of prior art video game "cockpits" with local processors that are interconnected through a "hub processor" to enable players in diverse locations to communicate with one another and share in the game experience. (Diehl Decl., ¶ 7; Kehoe Decl., ¶ 17, Exs. D and E.)

Diehl also participated in the preparation of the appeal brief in the *Okor* case. (Diehl Decl. ¶ 9, Ex. C.) This 14 page brief demonstrated that the trial court had correctly dismissed Mr. Okor's *pro se* action because his patent required "a plurality of light pens" and Mr. Okor had testified that Sony did not use light pens. (*Id.*, Ex. C at 5 and 11.)

Finally, Diehl recalls working on a motion to transfer in the *Hoefer* case. (Diehl Decl. ¶ 12.) He has no recollection of ever reviewing the Hoefer patents, and there was no reason for him to do so, as the issue in this case was a transfer. (*Id.*) In any event, the Hoefer patents describe and claim a game system where control is based on a player's physical values such as a blood oxygen level. (Kehoe Decl., ¶¶ 28-29.)

---

[2] The one application that has apparently not been published is entitled "A System and Method of Interrupt Handling." Based on the title of this application, it is clearly related to the console and not to the accused peripheral devices (i.e. vibrating handheld controllers and headphones). (Diehl Decl. ¶ 13.)

Diehl never discussed Sony litigation or settlement strategy with any Sony in-house attorney or employee during his employment with Lerner David. (Diehl Decl., ¶¶ 10-11.) In addition, Diehl has not represented Sony in over five years. (*Id.* ¶ 20.)

## ARGUMENT

**I.   Disqualification Under R.P.C. 1.9(a) Is Unwarranted Because the Facts Underlying this Case and Diehl's Work For Sony Are Not Related.**

Sony correctly observes that its application to disqualify Diehl under R.P.C. 1.9(a) turns on whether Diehl's current representation of plaintiffs involves "the same or a substantially related matter" to the work Diehl performed for Sony more than five years ago. *Home Care Indus. Inc. v. Murray,* 154 F. Supp. 2d 861, 866 (D.N.J. 2001); *Bagdan v. Beck,* 140 F.R.D. 660, 668 (D.N.J. 1991).

Sony understandably fails to point out, however, that the application of the substantial relationship test requires a "'painstaking analysis of the facts.'" *Rohm and Haas Co. v. American Cyanamid Co.*, 187 F. Supp. 2d 221, 227 (D.N.J. 2001); *Carlyle Towers Condo. Ass'n v. Crossland Sav.*, *FSB,* 944 F. Supp. 341, 345 (D.N.J. 1996) (quoting *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469 (1980)). Disqualification motions are "'intensely fact-specific,'" *Carlyle*, 944 F. Supp. at 345 (citation omitted), because disqualification is only warranted "'where the issues between the former and current suits are ***practically the same*** or where there is a ***patently clear relationship*** between them.'" *Home Care*, 154 F. Supp. 2d at 866 (quoting *Reardon,* 83 N.J. at 472 (emphasis added and internal quotation omitted)).

Moreover, the substantial relationship test is applied stringently as "'motions to disqualify are viewed with disfavor'" and "'are often made for tactical reasons.'" *Carlyle*, 944 F. Supp. at 345 (citations omitted). Indeed, the Courts in this District "'exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's

7

respect'" because "'the opposite effect is just as likely – encouragement of vexatious tactics, which increase public cynicism about the administration of justice.'" *Rohm and Haas*, 187 F. Supp. 2d at 227 (quoting *Carlyle*, 944 F. Supp. at 345). Thus, disqualification is denied "except when absolutely necessary." Carlyle, 944 F. Supp. at 345 (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993)).

Sony, therefore, "must meet a 'heavy burden' of proof" to establish that Diehl's former representation is substantially related to his current representation of Thorner and VRF. *Rohm and Haas*, 187 F. Supp. 2d at 226-27. Sony has not sustained that burden here. There is simply no relationship between the facts and issues of this case and the patent prosecution and other matters identified by Sony that Diehl worked on more than five years ago.

### A. The Facts and Issues in this Case

To begin, the issue of relevance to this motion is whether Sony's vibrating handheld controllers and headphones infringe a claim of the '941 or '722 patents, respectively. Like all infringement questions, this determination will involve a two step process. First, this Court will construe the claims to define the meaning and scope of their limitations or elements. Next, the trier of fact will decide whether the limitations of the claims are found or embodied in the accused controllers and headphones. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

Thus, in regard to the '941 patent, the infringement determination will turn on whether Sony's handheld controllers include (1) a flexible pad; (2) a plurality of actuators (i.e., motors) attached to the pad to generate tactile sensation (i.e., vibration); and (3) a control circuit that uses a signal from a video game to activate the motors and cause vibration in accordance with events playing out on the screen of the video game. (Kehoe Decl. ¶ 11.) In regard to the '722 patent,

8

the infringement determination will turn on whether Sony's vibrating headphones include an audio signal processor that processes an audio signal generated by a video game system and a control circuit that generates a control signal for a tactile sensation generator. (Kehoe Decl. ¶ 15.)

The facts necessary to make an infringement determination here will be found in the structure and components of Sony's controllers and headphones, which are publicly available and easily disassembled and analyzed, standing alone. (Kehoe Decl. ¶¶ 34-35; Diehl Decl. ¶ 17.) The relevant structures of Sony's controllers and headphones has also been publicly known since 1999. (Kehoe Decl. ¶ 35.) Nothing more is necessary.

### B.     Diehl's Prosecution Work

Diehl's patent prosecution work for Sony while employed by Lerner David is unrelated to the facts surrounding the infringement questions in this case. Sony's declarants – Russell, Gewirtz, and Jessop – make no effort to provide any analysis, let alone the "painstaking analysis" required, to establish a substantial relationship between the facts surrounding these prosecution matters and the facts and issues in this case. *Rohm and Haas*, 187 F. Supp. 2d at 227.

This is hardly surprising as none of the patents or patent applications submitted by Sony are even remotely related to the structure and operation of Sony's vibrating handheld controllers and headphones. (Kehoe Decl., ¶¶ 31-32; Diehl Decl., ¶ 13.) Instead, they are all directed to the PlayStation console which actually produces the video game. (Kehoe Decl., ¶¶ 31-32.) The internal workings of the PlayStation console are technically and factually distinguishable from the facts at issue here concerning the generation of vibrations in Sony's accused controllers and headphones. (*Id*. ¶¶ 7-9.)

Indeed, Sony's '014 patent, which issued in 1999 and which covers the accused handheld controller, makes no reference to the internal workings of the PlayStation console. (Diehl Decl. ¶ 18, Ex. D.) Moreover, Sony should be estopped from making any claim of a relationship between Diehl's prosecution work and the facts of this case in view of its counsel's admission that the '941 patent covers Sony's "hand-held controllers for the PlayStation video game," *not* the video game console. (Hintz Decl., ¶ 3, Ex. 2, Hearing Tr. at 40, lines 15-20.)

In addition, all but one of the patents and applications listed in Gewirtz' declaration have issued or been published, and the one application that has not clearly relates to the console, not the peripheral devices at issue here. (Diehl Decl. ¶ 13.) Given that these patents and patent applications are unrelated to this case and are in the public domain, and that Diehl recalls little, if any, of the so-called "proprietary technical information" that he purportedly gained while serving Sony (*Id*.) Diehl's prosecution work more than five years ago has no relevance to this case. Nothing, in short, that Diehl might remember about "the primary microprocessor, various subprocessors, and other hardware and software aspects" (Sony Br. 14) of the PlayStation console has any bearing on this case.

C. **The Lightstream Patents**

Diehl's opinion concerning the Lightstream patents is also irrelevant to this case. These patents describe and claim a distributed entertainment system of interconnected prior art video game "cockpits" to enable players in diverse locations to communicate with each other and share the same gaming experience. (Kehoe Decl. ¶ 17.) Hence, the Lightstream patents claim an "entertainment system" with a plurality of cockpits having computer graphic displays, a "local processor" for each cockpit, and a "*hub processor responsible for maintaining a database of*

10

*players . . . for maintaining a description of the game universe, for communicating audio signals between local processors, and for communicating locations of crafts between local processors*."  (Kehoe Decl. ¶ 17, Ex. D, the '825 patent, claim 1 (emphasis supplied).)

It is obvious that the Lightstream patents have nothing of substance in common with the patents in suit and the accused Sony products.  Sony's vibrating controllers and headphones are not entertainment systems that use video game cockpits with local processors that are interconnected through a hub processor, as described and claimed in the Lightstream patents.  (Kehoe Decl. ¶ 18.)

Sony's argument that the Lightstream patents "cover[] the same basic subject matter as that claimed by Plaintiffs' patents" is contrived and easily punctured.  (Sony Br. 13.)  Sony's quotations from the '825 patent are accurate; namely, that the patent states at the outset that it "'relates to games that 'are multisensory in that the entertainment system stimulates the players through the visual, auditory, <u>tactile</u>, kinesthetic senses;'" and later, in column 5, that a joy stick is connected to a "'motion controller 47, which operates the electropneumatic servos of the full motion base which may move the cockpit 20 <u>to provide tactile and kinesthetic feedback to the player</u>.'"  (*Id*. (emphasis in original).)

The problem with Sony's reliance on these quotes is that they clearly refer to the prior art, and ***not*** the invention of the '825 patent.  Indeed, the first quotation is lifted from the "Background of the Invention" section of the patent, where the inventors specifically identify as "prior art" video game cockpits such as "Fighter Town" and "Magic Edge," which were mounted on hydraulic motion bases, and had joy sticks and graphical displays.  (Kehoe Decl. ¶ 17, Ex. D, at Col. 1, l. 10-40.)  Similarly, the inventors identify a suitable motion base "made by Denne Developments LTD" immediately following the quotation from column 5.  (*Id.* at Col. 5, l. 64-

11

66.) It was thus well known that a video cockpit mounted on a moving base "provide[d] tactile and kinesthetic feedback," and that the video screen and loudspeakers would stimulate the "visual" and "auditory" senses, as stated in the Lightstream patents.

The drawback of existing cockpits was, as the Lightstream patents point out, that "there [were] no provisions for communications between game aircraft at different retail facilities or for communications with players at home computers." (*Id.* at Col. 1, l. 38-40 and 28-30.) The invention of the Lightstream patents overcame this deficiency by, as noted, routing the local processors for disparately located video game cockpits through a hub processor to enhance player communication and experience.

Diehl would not (and did not) have to know how prior art cockpits stimulated "visual, auditory, tactile, kinesthetic senses" in order to render an opinion that Sony did not infringe the Lightstream patents. (Kehoe Decl. ¶¶ 18 and 21-23.) All he needed to know was whether Sony sold an entertainment system with multiple cockpits connected to a hub processor. (*Id.*)

Put another way, Diehl would not (and did not) need to know how Sony's hand-held controllers or headphones generate lights, vibration, or sound to analyze the claims of the Lightstream patents, as Sony suggests. (Sony Br. 13.) The Lightstream patents do not teach how to provide lights, vibration, or sound, or the sequence of commands that would be needed to implement these features, and the claims are not directed to and make no mention of these matters. (Kehoe Decl. ¶¶ 22-23.)

### D. Diehl Never Discussed Litigation or Settlement Strategy with Russell in Connection with the *Okor* and *Hoefer* Matters, or Otherwise

Significantly, Sony's brief does not argue for disqualification on the ground that Diehl is familiar with Sony's litigation and settlement strategies. Nevertheless, Sony's declarant Russell makes several preposterous statements in this regard that require refutation.

12

First, in connection with the *Okor* matter, Russell avers that Diehl assisted Sony by "researching and drafting appeal briefs and researching for and participating in settlement discussions," and that "Diehl had numerous communications with me [i.e., Russell] regarding SCEA's litigation strategy." (Russell Decl., ¶¶ 11-12.) This is sheer fantasy. Diehl's participation in the *Okor* case was limited to writing **one** 14-page appeal brief in 2001, upholding summary judgment of noninfringement against a *pro se* plaintiff.[3] (Diehl Decl. ¶ 9.) Although Diehl does not recall having ever had any "communications" with Russell, he is certain that he never discussed settlement or litigation strategy with Russell in connection with the *Okor* case (or any other matter). (*Id.*) Indeed, there was nothing to settle and no strategy was involved in opposing a frivolous appeal.

Russell also claims that "Diehl had numerous communications with me and other members of SCEA's in-house counsel regarding SCEA's litigation strategy" in connection with the *Hoefer* case. (Russell Decl., ¶ 15.) These alleged "communications" never occurred. (Diehl Decl., ¶ 11.) Diehl's involvement with the *Hoefer* case was limited to working on a motion to transfer. (*Id.*) There was no "strategy" to discuss.[4]

### E.  Conclusion

In *Ciba-Geigy v. Alza Corp*, 795 F. Supp. 711 (D.N.J. 1992), the Court rejected disqualification in a patent case posing a much closer call than presented here. The defendant moved to disqualify plaintiff's counsel pursuant to RPC 1.9 in an infringement suit involving a

---

[3] This was a simple brief because Mr. Okor admitted in his deposition that Sony did not sell or use "light pens," as required by the claims of his patent. (Diehl Decl. ¶ 9.)

[4] Although Russell also claims that Diehl reviewed the Hoefer patents, he does not remember doing so. (Diehl Decl., ¶ 12.) In any event, the Hoefer patents describe and claim a game system based on a player's physical values such as a blood oxygen level. (Kehoe Decl., ¶ 28.) The Hoefer patents, like the Okor patent, have no factual relationship with Sony's vibrating controllers or headphones. (*Id.* ¶ 29.)

transdermal delivery system for nicotine ("nicoderm") because the plaintiff's attorney had previously represented the defendant in an action involving the transdermal delivery of a different drug, estradiol ("estaderm"). The defendant argued that the two representations were substantially similar because both estaderm and nicoderm were tested in a similar manner and both used similar rate control membranes. The Court disagreed, holding that the two chemicals were different and that, beyond sweeping generalizations, the defendant had failed to show how the two litigations were substantially similar in fact. *Id.* at 717-18.

Similar reasoning should control here. This case involves vibrating handheld controllers and headphones, not video game cockpits and hub processors, or the internal workings of microprocessors in the PlayStation console. Sony's sweeping generalizations cannot erase the factual differences between this case and the matters Diehl handled for Sony more than five years ago. Sony's motion for disqualification under R.P.C. 1.9(a) should be denied.

## II. R.P.C. 1.9(b) Has No Application Here

Sony's motion to disqualify under R.P.C. 1.9(b) founders on the demonstrably false premise that Diehl was working at Lerner David while "Gregory S. Gewirtz and other lawyers at the Lerner David firm were representing SCEA in the *Immersion* case." (Sony Br. 15.) In fact, Diehl left Lerner David in June 2004, and the docket sheet in *Immersion v. Sony* establishes that Gewirtz and Lerner David did not make an appearance in that case until December 2004. (Hintz Decl. ¶ 4, Ex. 3.) Diehl never worked for Lerner David when it represented Sony in the *Immersion* case. (Diehl Decl. ¶ 16.) Moreover, Diehl had no knowledge of the *Immersion* case while at Lerner David and did not begin to learn the facts giving rise to this action until after April 2006, when he was retained by plaintiffs. (*Id.*)

14

### III. R.P.C. 1.9(c) Is Inapplicable As Well

Sony's motion with respect to R.P.C. 1.9(c) fails for two reasons.[5] First, Diehl never received any information (confidential or otherwise) concerning Sony's vibrating controllers or headphones while he was employed by Lerner David. (Diehl Decl. ¶ 14.) Indeed, Sony does not say that he did. Consequently, Diehl could not use any information "to the disadvantage of" Sony in violation of R.P.C. 1.9(c)(1).

Second, information relevant to whether Sony's controllers and headphones embody the limitations is "generally" known as the products are readily purchased and easily disassembled. *See* R.P.C. 1.9(c)(1). Moreover, Sony's '014 patent, which issued in 1999, before Diehl began working at Lerner David, fully discloses the structure and operation of the accused controller.

R.P.C. 1.9(c)(1) is, accordingly, inapplicable.

### IV. The Balance of Hardship and Harm Weighs Against Disqualification

If, for reasons that are not apparent, the Court believes that the matters are, in fact, substantially related, disqualification should still be denied in view of the hardship plaintiffs would suffer, if Diehl was disqualified, and the absence of any real harm to Sony if he is not. *See, e.g.*, *Home Care*, 154 F. Supp. 2d at 867**;** *In re Gabapentin Patent Litig.*, 432 F. Supp. 2d 461, 464 (D.N.J. 2006) ("Resolution of [the issue of disqualification] requires a balancing of the hardship to the client whose lawyer is sought to be disqualified against the potential harm to the adversary should the attorney be permitted to proceed.").

---

[5] R.P.C. 1.9(c) provides, in pertinent part:
    (c) a lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

    (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, ***or when the information has become generally known.*** (Emphasis added.)

Plaintiffs are financially troubled and are unlikely to be able to find or afford another lawyer that is capable of handling this case. (Thorner Decl. ¶ 9.) The facts and issues in this litigation are complex and required a significant amount of review, legal analysis, and novel pleading. It is doubtful that a new attorney would readily grasp the facts and issues that Diehl has spent significant time investigating. Moreover, Diehl has represented Thorner for more than three years. (*Id.*) As a result of his extended representation of Thorner, Diehl has acquired significant knowledge of the Thorner patents and developed a relationship of trust with Thorner. (*Id.*)

Sony, on the other hand, is one of the largest corporations in the world and can draw on vast pools of lawyers and resources. Moreover, Thorner has never received any confidential information from Sony or Diehl (*Id.*), and Diehl has not represented Sony in over five years. (Diehl Decl. ¶ 20.) It is hard to conceive how Sony would be harmed if Diehl continues to represent plaintiffs.

## CONCLUSION

For all the foregoing reasons, plaintiffs Craig Thorner and Virtual Reality Feedback Corporation respectfully submit that the motion to disqualify Glen M. Diehl and Diehl Servilla should be denied in all respects.

Respectfully submitted,

Dated: August 17, 2009

By: s/ Glen M. Diehl
Glen M. Diehl, Esq.
DIEHL SERVILLA LLC
77 Brant Avenue, Suite 210
Clark, New Jersey 07066
Telephone: (732) 815-0404
Facsimile: (732) 815-1330
Attorneys for Plaintiffs