**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRAIG THORNER, et al., | CIVIL ACTION NO. 09-1894 (MLC) |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| SONY COMPUTER ENTERTAINMENT AMERICA LLC, et al., | |
| Defendants. | |

**COOPER, District Judge**

The plaintiffs, Craig Thorner and Virtual Reality Feedback Corporation ("Thorner"), commenced this action alleging patent infringement pursuant to 35 U.S.C. § 271 as well as common law fraud, malpractice, and conspiracy claims, against the defendants, Sony Computer Entertainment America LLC, Sony Computer Entertainment Inc., Gregory S. Gewirtz, Lerner David Littenberg Krumholz & Mentlik, LLP, Performance Designed Products LLC, Riley Russell, Larry C. Russ, Marc A. Fenster, and Russ August & Kabat, PC. (See dkt. entry 1, Compl.)  The matter now comes before the Court on a motion for enforcement of a settlement agreement and for sanctions by defendants Sony Computer Entertainment America LLC, Sony Computer Entertainment Inc., Sony Electronics Inc., and Riley Russell (collectively "Sony").  (See dkt. entry no. 181, Mot. for Enfmt. & Sanctions.)  Thorner thereafter moved for the Magistrate

Judge's recusal with respect to the motion for enforcement and
sanctions.  (See dkt. entry no. 190, Mot. for Recusal.)[1]

The Court finds that Sony has shown that a settlement
agreement was entered into between the parties, and that Thorner
has not demonstrated why the settlement should not be enforced.
Therefore, the Court grants the part of Sony's motion concerning
enforcement, and Thorner is ordered to sign the agreement as
written.  Sony's request for sanctions in the form of costs and
counsel fees is denied.

**I.   BACKGROUND**

The complicated history of litigation and licensure between
the plaintiffs and defendants is not relevant to resolution of
these motions, and the parties have demonstrated in their written
submissions that they are knowledgeable about that history.
Because we write mainly for the parties, we will focus only on
those facts pertaining to the settlement negotiations.

**A.   Representation**

Thorner was represented by Raymond Niro and Matthew McAndrews
from the firm Niro, Haller & Niro ("the Niro Firm") during
negotiations.  (See dkt. entry no. 181-2, Certification of Daniel

---

[1] The Court having decided the motion to enforce settlement,
Thorner's motion for recusal of the Magistrate Judge with respect
to the motion to enforce settlement is moot, and therefore will be
denied as moot.

Johnson at ¶ 1; dkt. entry no. 191, Pls. Br. in Opp'n to Defs. Mot. & in Support of Pls. Mot. at 9 ("Pls. Opp'n Br.").)   The retainer agreement between Thorner and the Niro Firm specified that Thorner had control over settlements: "As noted above, [Thorner] will approve and have complete authority over the terms and conditions of any license, sale or settlement.  [The Niro Firm], in turn, will evaluate, give advice and make recommendations to [Thorner] on any amount that is offered." (See Pls. Opp'n Br. at 10.)   Thorner and the Niro Firm have since terminated this relationship.  (See id. at 10 n.2.)

Sony was represented by Daniel Johnson of the law firm of Morgan, Lewis & Bockius LLP.  (See Certification of Johnson at ¶ before ¶ 1.)

## B.   Negotiations[2]

On June 7, 2012, Niro presented a formal settlement offer by email to all defendants.  (See dkt. entry no. 181-5 Certification of Johnson, Ex. C, June 7, June 11 Email Chain.)   The terms of the offer sought payment of $1.4 million to Thorner, who in turn agreed to, inter alia, grant a fully paid-up license to Sony for the patents at issue, release all other defendants, and seek dismissal of all counterclaims.  (See id.)  Johnson called Niro on June 12,

---

[2] The statement of facts pertaining to the timeline of negotiations is drawn from both parties' submissions and serves as a summary of the undisputed facts unless otherwise noted.

2012, informing Niro that he would pass along Sony's response. (See Certification of Johnson at ¶ 7.)  On June 14, 2012, Johnson informed Niro that Sony offered $100,000 for a full release of all claims, dismissal of claims against the other defendants, and a fully paid-up license covering the patents-in-suit as well as all continuations and continuations-in-part.  (See id. at ¶ 8.)

The Magistrate Judge held a status conference on June 26, 2012, wherein counsel for the parties relayed that an offer had been made and negotiations continued.  (See id. at ¶ 9.)  On July 3, 2012, Niro again emailed Johnson seeking a response on the offer in the June 7, 2012 email.  (See id. at ¶ 10.)  On July 16, 2012, Niro emailed again, seeking a meeting in person or with the Magistrate Judge.  (See id.)  Johnson responded that, until the settlement demand was reduced, Sony was not interested in meeting. (See id.)

Johnson made a counter-offer of $150,000 to Niro on July 17, 2012, along with a statement that Sony would not be interested in a settlement for the amount Thorner sought.  (See id. at ¶ 11.)  Niro replied on July 18, 2012, demanding $875,000 to settle all claims. (See id.)  Johnson replied the same day, rejecting this offer and telling Niro that "Sony would not meet in the middle".  (See id.)

On July 23, 2012, Niro again emailed Johnson, encouraging a continuation of negotiations.  (See id. at ¶ 12.)  The parties

4

spoke via telephone on August 1, 2012, when Johnson informed the Niro Firm that there was little prospect for settlement if the demand was not lowered.   (See id. at ¶ 13.)   The following day, Johnson sent an email offering $250,000.  (See id.)  Johnson increased Sony's offer to $275,000 on August 3, 2012, in return for licenses to Thorner patents and applications; the offer encompassed claims against all parties.  (See id. at ¶ 14.)  Niro responded on August 6, 2012, lowering Thorner's demand to $325,000.  (See id.)

The Magistrate Judge called Johnson on August 7, 2012 and asked whether Sony would settle for $300,000, subject to other conditions.  (See id. at ¶ 15.)  Johnson indicated that Sony would accept such a settlement.  (See id.)  On the same day, the Niro Firm called Johnson "indicating that they had struck an accord with Mr. Thorner over fees and that the case was settled.  Thorner's counsel summarized the terms of this agreement in an August 7 email to [Johnson]."  (Id. at ¶ 16.)  The August 7 email read as follows:

> This confirms and is further to our discussion of a few moments ago.  As recommended by Magistrate Judge Arpert and accepted by Craig Thorner and Virtual Reality Feedback Corporation:
> 1.    Defendants shall pay Craig Thorner the sum of Three Hundred Thousand Dollars ($300,000.00) within ten (10) days of the effective date of the parties' Settlement, Release and License Agreement, but in no event later than August 30, 2012;
> 2.    The parties will dismiss with prejudice all claims that were or could have been brought against one another in the litigation;
> 3.    Plaintiffs will grant Defendants full releases and covenants-against-suit with respect to the patents-in-

> suit and all of Plaintiffs' existing patents and patent
> applications;
> 4.   The parties shall bear their own costs and
> attorney's fees.
>
> Please confirm that these terms are acceptable to
> Defendants.  Assuming so, we look forward to working
> with you over the next few days to finalize an
> agreement.

(Dkt. entry no. 121-10, Certification of Johnson, Ex. H, Aug. 7-8

Email Chain at 1-2.)  Within the same email chain, Niro sent: "Let

us know if our firm should prepare the first draft of the formal

Settlement Agreement, or if you would prefer to prepare the initial

draft.  We are fine either way, just let us know."  (Id. at 1.)

   Johnson emailed the Niro Firm on August 8, 2012, to clarify

some terms in the August 7, 2012 email, and to demand that Thorner

provide covenants-not-to-sue Sony or its related entities for a

period of 10 years with a "liquidated damages provision that must

encompass payment of all fees paid plus an amount to be agreed

upon." (Dkt. entry no. 181-11, Certification of Johnson, Ex. I,

Aug. 8-9 Email Chain at 3.)  The Niro Firm responded with "a draft

Settlement and License Agreement reflecting the agreed upon terms

of settlement." (Id. at 2.)  With respect to the liquidated

damages provision, the Niro Firm responded thusly:

> Regarding your request to add another provision (which
> was never mentioned or discussed at any point in the
> negotiations, much less agreed upon), your proposal is
> unworkable.  Along with a full release for all past
> actions, Plaintiffs are providing a paid-up license and
> covenant not to sue on the patents in suit, all of

6

> Plaintiffs' other patents, pending applications,
> continuations, divisionals, etc.  This is more than
> sufficient to fully protect Sony's interests.  If
> necessary, Magistrate Judge Arpert can confirm that we
> have accurately reflected the terms of settlement in the
> attached Agreement.

(Id.)  Sony's counsel replied to Niro:

> Let me be very clear there were no agreed upon terms.
> We agreed on an outline with the only specifics relating
> to amount paid.  We just learned that Thorner and Diehl
> sued Wal Mart [sic] yesterday.  There is no way Sony is
> going to conclude a deal only to learn that its
> customers have been sued by Thorner thus exposing Sony
> to indemnity obligations.
> I will review your draft and decide if it is sufficient.
> If it is not and Sony's concerns are not addressed, we
> will not proceed.

(Id.)  Thorner's counsel responded:

> We disagree with your position that there were no agreed
> upon terms . . . [sic] but I believe all of the concerns
> in your email are addressed in the draft in any event.
> There is a full release, license and covenant not to
> sue, which applies to Sony and its affiliates,
> subsidiaries, customers, distributors, purchasers,
> users, etc [sic], with respect to all Sony products.
> Any lawsuit against Wal-Mart (or any other customer of
> Sony) would clearly have no implication to Sony or any
> Sony products.
> If you believe additional language is necessary to
> accomplish this objective, please send us a redlined
> version of the Agreement.

(Id. at 1.)  Johnson then reviewed the agreement and spoke with

Niro via telephone to inform him that the agreement was acceptable

to Sony and subject to minor revisions would be signed by Sony.

(See Certification of Johnson at ¶ 23.)

Niro sent two emails on August 13, 2012.  One stated: "Our client has instructed us to cancel the settlement with Sony. Plaintiffs hereby withdraw any and all outstanding offers, and reject any pending offers from Sony" and was time-stamped 8:12AM. (Dkt. entry no. 181-14, Certification of Johnson, Ex. L, Aug. 13, 2012 8:12AM Email at 1.)  One was time-stamped at 10:43AM and proposed staying expert discovery on August 13, 2012, "in light of the pending issues before Magistrate-Judge Arpert". (Dkt. entry no. 181-13, Certification of Johnson, Ex. K, Aug. 13, 2012 10:43AM Email at 1.)  Johnson responded to the email withdrawing from settlement negotiations and stated that Sony considered the matter settled.  (See Certification of Johnson at ¶ 26.)

The parties' counsel later spoke via telephone and Johnson states that Niro informed him that "Thorner was withdrawing the settlement because Thorner had learned that the United States Patent Office was about to allow additional claims that might read on Sony's controllers.  Mr. Niro's firm subsequently withdrew from this case as Thorner's counsel."  (See id. at ¶ 27.)[3]

_____

[3] Thorner argues that no settlement occurred and thus disputes this characterization of his motivation for withdrawing his outstanding offers.  (See Pls. Opp'n Br. at 11.)  Thorner also claims that he terminated the Niro Firm.  (See id. at 10 n.2.) Thorner does not, however, dispute that the negotiations occurred or that he was aware of them; instead he only claims that he did not personally participate in any discussions with the Magistrate Judge or negotiations with Sony or Sony's counsel.  (See id. at 11-12.)

## II.  Analysis

The Court will first determine whether a settlement exists and can be enforced before deciding whether sanctions are appropriate at this juncture.

### A.   Motion to Enforce a Settlement

Before enforcing an agreement, the Court must determine whether a settlement agreement has coalesced beyond mere negotiations to the level of becoming binding and enforceable on the parties.  See Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F.Supp. 342, 348 (D.N.J. 1996).  State law applies when construing or enforcing settlement agreements in federal lawsuits.  See Langella v. Anderson, 734 F.Supp. 185, 191-92 (D.N.J. 1990).  Thus, New Jersey's fundamental principles of contract law govern the resolution of the part of the motion seeking enforcement.  New Jersey law provides that "an agreement to settle a lawsuit is a contract which, like all other contracts, may be freely entered into, and which a court, absent a demonstration of fraud or other compelling circumstance, shall honor and enforce as it does other contracts."  Pascarella v. Bruck, 190 N.J.Super. 118, 124-25 (App.Div. 1983) (internal citation and quotation omitted).  An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing.  See id. at 124.

9

The party seeking to enforce the alleged settlement agreement has the burden of proving the existence of the agreement under contract law.  Amatuzzo v. Kozmiuk, 305 N.J.Super. 469, 475 (App.Div. 1997); see also Nolan v. Lee Ho, 120 N.J. 465, 472 (1990).  Analogous to the standard of review used for a motion for summary judgment, on a disputed motion to enforce a settlement, the Court must hold a hearing to resolve any dispute of material fact unless the available competent evidence, considered in a light most favorable to the non-moving party, is "so one-sided" as to render the hearing unnecessary.  Amatuzzo, 305 N.J.Super. at 474-75.

"Traditional contract law principles provide that a contract arises from the manifest intentions of the parties to engage in an offer and acceptance of sufficiently definite essential terms." Days Inns Worldwide, Inc. v. Shaikh, No. 07-157, 2010 WL 3636227, at *3 (D.N.J. Aug. 20, 2010) (internal citation and quotation omitted).  A contract must be accompanied by consideration to be enforceable.  See Friedman v. Tappan Dev. Corp., 22 N.J. 523, 533 (1956).  In bilateral contracts or agreements, such as the one here, where the parties make mutual promises to do some future act, "the consideration of the promise of one party is a promise on the part of the other."  Id.

The form of the contract is not the focus of the Court; parties may bind themselves through an informal memorandum, even if

they intend to execute a more formal document memorializing the agreement.  See Berg Agency v. Sleepworld-Willingboro, Inc., 136 N.J.Super. 369, 374 (App.Div. 1975).  "[I]f the negotiations are finished and the contract between the parties is complete in all its terms and the parties intend that it shall be binding, then it is enforceable, although lacking in formality and although the parties contemplate that a formal agreement shall be drawn and signed." Moran v. Fifteenth Ward Bldg. & Loan Ass'n, 131 N.J. Eq. 361, 366 (N.J. Ch. 1942).  Thus, courts will enforce settlement agreements notwithstanding the absence of a future writing so long as the parties agreed upon the essential terms of a settlement, even if they left the details to be "fleshed out" in a writing later.  Lahue v. Pio Costa, 263 N.J.Super. 575, 596 (App.Div. 1993); Hagrish v. Olson, 254 N.J.Super. 133, 138 (App.Div. 1992) (quoting Berg Agency, 136 N.J.Super. at 377) ("'So long as the basic essentials are sufficiently definite, any gap left by the parties should not frustrate their intention to be bound.'").

i.    **Essential Terms and Manifestations of Assent**

Both parties manifested the intention to engage in an offer and acceptance of settlement terms.  See Days Inns Worldwide, 2010 WL 3636227, at *3; Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992).  The attorneys for the parties engaged in extensive settlement negotiations from May to August, exchanging emails and

11

phone calls and participating in discussions with the Magistrate
Judge. (See Certification of Johnson at ¶¶ 1, 4-17; dkt. entry no.
191-1, Certification of Craig Thorner at ¶¶ 45-49.)[4] The parties
came to an agreement on August 7, 2012, as reflected in the
undisputed facts: (1) the amount of the settlement was set at
$300,000 with the Magistrate Judge's assistance; (2) Niro reported
that Thorner had struck an accord with the Niro Firm over fees and
that the case was settled; and (3) the Niro Firm summarized the
essential terms of the Settlement Agreement in an email to Johnson.
(See Certification of Johnson at ¶¶ 3-4.) The email memorializing
the agreement struck over the phone and the draft of the formal
Settlement Agreement provide the essential terms of the settlement:

> 1.   Sony would pay Thorner $300,000.00;
> 2.   All parties would dismiss with prejudice all claims
> that were or could have been brought against one another
> in the litigation;
> 3.   Thorner would grant the defendants full releases
> and covenants-against-suit with respect to the patents-
> in-suit and all of Thorner's existing patents and patent
> applications;
> *4.*   The parties would bear their own costs and
> attorney's fees.

(See Aug. 7-8 Email Chain at 1-2; dkt. entry no. 181-12,
Declaration of Johnson, Ex. J, Settlement Agreement Draft.) These
terms are consistent with the ongoing negotiations the parties had
engaged in through email and discussions with the Magistrate Judge.

---

[4] Whether the attorneys had authority to bind the parties to
the settlement will be addressed infra.

(See, e.g., June 7, June 11 Email Chain (making settlement offer
for $1.4 million in exchange for Thorner's release and fully paid-
up license, a release to other defendants, all claims and counter-
claims dismissed with prejudice, and all parties bear their own
attorneys' fees, costs and expenses); dkt. entry no. 181-8,
Certification of Johnson, Ex. F, Aug. 2 Email Chain at 1 (stating
that Sony was not willing to pay $400,000 to settle the case and
that "any settlement had to include the entire action and include
the Thorner pending applications and existing portfolio");
Certification of Johnson at ¶ 15.)

Thorner has not disputed the materiality of these essential
terms, instead arguing that he considered additional, missing terms
to also be material.  (See Pls. Opp'n Br. at 12-14.)  Thorner
claims that he did not see the draft Settlement Agreement until
August 14, 2012.  (See Certification of Thorner at ¶¶ 48-53.)
These other terms were not discussed during the protracted
negotiations between the Niro Firm and Johnson, nor were the terms
raised at all until after Thorner decided to renege on the
Settlement Agreement.  (See June 7, June 11 Email Chain; Aug. 2
Email Chain; Aug. 7 Email Chain; Certification of Johnson at ¶¶ 25-
27; Certification of Thorner at ¶¶ 50-53.)  This vitiates his claim
that the attempt to void the agreement on August 9, 2012 was based
on the fact that these terms were missing from that agreement.  See

13

Pascarella, 190 N.J.Super. at 126 (rejecting plaintiffs' argument
that "paragraph four of the settlement agreement does not reflect
words plaintiffs would, perhaps, rather have chosen" because
"plaintiffs sought to void the settlement before having seen this
paragraph.")  Thus, the Court finds that the terms essential to
settling this litigation remain those delineated in the August 7,
2012 email and the draft Settlement Agreement.

Thorner argues in his papers that "there is no written
manifestation or other embodiment of any agreement by Thorner or
VRF to any settlement agreement".  (See Pls. Opp'n Br. at 32.)
This is refuted by the emails from the Niro Firm to Johnson.  (See
Aug. 7 Email Chain at 1-2.)  During a phone call between counsel,
the parties came to an agreement on specific terms that were later
informally memorialized in an email sent from the Niro Firm to
Johnson.  (See Certification of Johnson at ¶¶ 15-17; Aug. 7 Email
Chain at 1-2.)  The email explicitly stated that the terms were
"accepted by Craig Thorner and Virtual Reality Feedback
Corporation" and included four paragraphs summarizing the parties'
agreement.  (See id.)  In a later email, Niro stated "Let us know
if our firm should prepare the first draft of the formal Settlement
Agreement, or if you would prefer to prepare the initial draft."
(See id. at 1.)  Thorner's attorney made clear manifestations of
Thorner's assent to the terms of the settlement as reflected in the

14

summary provided in the August 7, 2012 email and in the draft
Settlement Agreement that was prepared.  (See id. at 1; see also
Settlement Agreement Draft.)

Sony also manifested agreement to the terms of the Settlement
Agreement.  In addition to the oral agreement struck by counsel
during the August 7, 2012 phone call, Johnson received the summary
of terms and accepted them as the informal memorialization of the
Settlement Agreement, which was to be reduced to a completed
writing expressing both those essential terms and additional terms.
(See Certification of Johnson at ¶¶ 15, 16, 17.)  After hearing
that Thorner had filed suit against Wal-Mart for infringement,
Johnson contacted the Niro Firm with concerns about the scope of
coverage under the covenant-not-to-sue language.  (See id. at ¶¶
19-21.)  The parties exchanged emails about adding a liquidated
damages provision and whether Sony's concerns about the scope of
the covenant-not-to-sue language could be allayed.  (See id. at ¶¶
21, 22, 23.)  The Niro Firm refused to include any liquidated
damages provision and reassured Johnson that Sony's interests were
fully protected.  (See id.)  Moreover, when Johnson threatened that
"the final release language had not yet been agreed upon and that
Sony would not proceed unless the scope of the release issue was
resolved", Niro responded "[w]e disagree with your position that
there were no agreed upon terms . . . but I believe all the

15

concerns in your email are addressed in the draft in any event."
(See id. at ¶¶ 21-22.)[5]  After this hesitation was addressed,
Johnson reviewed the terms of the agreement and, concurring with
Niro that the language was sufficient, called Niro to tell him
"that the agreement was acceptable to Sony and subject to minor
revisions would be signed by Sony."  (See id. at ¶ 23.)[6]

Thorner argues that Johnson's suggestion of "minor revisions"
is an indication either that the Settlement Agreement was
incomplete (and therefore not binding), or that such revisions
could be unacceptable to Thorner (and therefore no agreement had
been reached).  (See Pls. Opp'n Br. at 14.)  This argument is
unpersuasive in light of New Jersey's contracts law, which

_____

[5] As reflected in these emails, Thorner's counsel consistently
took the position that both parties had reached an agreement on all
essential terms, even in the face of Sony's counsel posturing that
the agreement had not yet been finalized.  (See Certification of
Johnson at ¶¶ 16, 22; Aug. 7 Email Chain at 1 ("[the terms]
accepted by Craig Thorner and Virtual Reality Feedback
Corporation").)

[6] Thorner has not argued that any of these events did not
occur nor has he otherwise disputed the facts as laid out in Sony's
papers; Thorner has only argued that he personally did not
participate in settlement negotiations and that he did not speak to
either Sony or the Magistrate Judge directly to confirm his
acceptance of a Settlement.  (See Pls. Opp'n Br. at 11-12.)
Nonetheless, notably absent in Thorner's list of denied
communications is any mention of whether Thorner spoke with his own
counsel to accept or reject the settlement.  (See id.)  While the
burden of proving an enforceable agreement lies on the party
seeking enforcement, Thorner cannot prevail without at least
presenting facts that suggest a genuine dispute of fact with
respect to the evidence mustered by Sony.  See Amatuzzo, 305
N.J.Super. at 475.

16

indicates that gaps in contracts, or even lack of any written contract, will not preclude a court from enforcing the essential terms of an agreement between parties.  See Lahue, 263 N.J.Super. at 596; Hagrish, 254 N.J.Super. at 138 ("So long as the basic essentials are sufficiently definite, any gap left by the parties should not frustrate their intention to be bound.") (internal citation and quotation omitted).

A contract must be accompanied by consideration to be enforceable.  See Friedman, 22 N.J. at 533.  In this bilateral Settlement Agreement, Sony's promise to pay $300,000 serves as sufficient consideration for Thorner's promises.  See id.  Thus the parties have both agreed to an enforceable Settlement Agreement supported by consideration.

### ii.  Authority of Counsel

Thorner argues that any purported agreement entered into by the Niro Firm and Sony's counsel is void because his attorney had neither actual nor apparent authority to unilaterally accept the settlement on his behalf.  (See Pls. Opp'n Br. at 9-12, 29-33.) Thorner points to the retainer agreement between himself and the Niro Firm, which states that "[Thorner] will approve and have complete authority over the terms and conditions of any license, sale or settlement."  (See Pls. Opp'n Br. at 29.)  Thorner also argues that, because he did not make a voluntary act placing the

Niro Firm in a position where an ordinarily prudent person would be justified in presuming that the Niro Firm had authority to enter into a settlement on his behalf, there was no apparent authority on which the Niro Firm could enter into contracts that would bind Thorner.  (See id. at 30.)  In response, Sony argues that (1) case law does permit an attorney acting as an agent in settlement negotiations to enter into contracts on the client's behalf; and (2) the facts as reflected in the record demonstrate that a reasonably prudent person would justifiably rely on the apparent authority of Thorner's counsel to enter into an agreement on his behalf.  (See dkt. entry no. 194, Defs. Reply Br. at 8-9.)

New Jersey courts have held that "negotiations of an attorney are not binding on the client unless the client has expressly authorized the settlement or the client's voluntary act has placed the attorney in a situation wherein a person of ordinary prudence would be justified in presuming that the attorney had authority to enter into a settlement, not just negotiations, on behalf of the client."  See Amatuzzo, 305 N.J. Super. at 475 (internal citations omitted).  In that case, which Sony distinguishes from the facts here, the counsel for the parties notified the court that they had agreed to enter a stipulation of settlement; the defendant subsequently refused to sign the stipulation, however, claiming that he had not authorized his attorney to enter such a settlement.

18

See id. at 473.  The defendant in Amatuzzo submitted a
certification in which he stated under oath that he had told his
attorney that he strenuously objected to the terms of the
settlement as proposed and that any agreement by his counsel was
without his consent or authorization.  See id.  The appellate court
found that this certification was sufficient to raise a material
and substantial issue regarding the attorney's authority, and
accordingly remanded the matter for an evidentiary hearing on that
question.  See id. at 476.  In contrast to that case, although
Thorner claims that his counsel had no actual authority to accept
the Settlement Agreement, Thorner has submitted no sworn statements
or other evidence that he objected to the terms of the agreement
proposed by the Niro Firm prior to the parties accepting it.  See
United States v. Lightman, 988 F.Supp. 448, 464-65 (D.N.J. 1997).
Rather Thorner sought to void the contract before he even reviewed
it, and all of Thorner's objections arose after the settlement was
accepted.  (See Pls. Opp'n Br. at 11-12.)

     Thorner also argues that the Niro Firm had no apparent
authority to do bind him to a settlement agreement.  To determine
whether an agent has apparent authority, the key inquiry is whether
"the principal, by his voluntary actions, placed the agent in such
a situation that a person of ordinary prudence, conversant with
general business practice, is justified in believing that the agent

had authority to perform the act in question." U.S. Plywood Corp.
v. Neidlinger, 41 N.J. 66, 74 (1963) (internal citation omitted).
Thorner's attorneys had apparent authority to bind him to the
Settlement Agreement, because Thorner knowingly placed his
attorneys in such a situation that Sony, Sony's counsel, and the
Magistrate Judge were justified in believing that Thorner's
attorneys had authority to bind Thorner to the Settlement
Agreement.

     Thorner argues that there was no voluntary act sufficient for
apparent authority based on Niro's failure to copy Thorner on all
negotiations emails; on the fact that Thorner did not personally
speak with Sony, Sony's counsel, or the Magistrate Judge to accept
the Settlement Agreement; and on the failure of the parties to put
the agreement on the record. (See Pls. Opp'n Br. at 30-33.)
However, Thorner did not need to have been directly or intimately
involved with the communications between counsel and the Magistrate
Judge for there to have been an agreement, nor did the parties have
to put the agreement on the record for it to be binding. See Longo
v. First Nat'l Mortg. Sources, No. 07-4372, 2010 U.S.Dist. LEXIS
80510, *9-10 (D.N.J. July 14, 2010). Thorner's involvement with
negotiations was through his attorneys, whom he freely chose to act
as his agents, and he is therefore bound by their actions on his
behalf. See MedPointe Healthcare, Inc. v. Kozachuk, 373 Fed.Appx.

62, 66 (Fed. Cir. 2010) (citing <u>Link v. Wabash R.R. Co.</u>, 370 U.S. 626, 633-34 (1964)).[7]

Throughout the lengthy negotiations, Johnson "was repeatedly advised by Plaintiffs' counsel that his client, Mr. Craig Thorner, was fully aware of and participated in the negotiations." (Certification of Johnson at ¶ 1.)  Thorner also has no evidence to contradict Johnson's certification that Thorner had engendered the belief that the Niro Firm possessed Thorner's authority to finalize the Settlement Agreement, since the Niro Firm was authorized to convey to Johnson the offer that was accepted by Sony.  (<u>See</u> June 7, June 11 Email Chain.)  On August 7, 2012, Johnson received a telephone call from Thorner's counsel "indicating that they had struck an accord with Mr. Thorner over fees and that the case was settled."  (<u>Id.</u> at ¶ 16.)  During the extensive negotiations regarding the language of the Settlement Agreement, the Niro Firm never gave any indication that Thorner had any reservations regarding the fundamental terms of the agreement, which formed the substance of the original offer that the Niro Firm tendered to Johnson on June 7, 2012, at the Magistrate Judge's request.  (<u>See</u>

_____

    [7] In the event Thorner nonetheless feels his attorneys failed to remain within the bounds of their authority as reflected in his retainer agreement with the Niro Firm, his route of redress would be a malpractice action against the firm, as any principal must bring against a disobedient agent, not through rescission of a properly entered into contract. <u>See</u> <u>Link</u>, 370 U.S. at 634 n.10.

June 7, June 11 Email Chain at 2.)  Finally, the draft Settlement

Agreement, which was prepared by the Niro Firm, explicitly states:

> WHEREAS, Plaintiffs, Defendants, Third Party Plaintiffs
> and Third Party Defendants and their respective counsel
> and representatives, warrant that the authorized
> representatives who have executed this Agreement have
> full authority to enter into this Agreement on behalf of
> all parties having an interest in the Lawsuit and the
> subject matter of this agreement[.]

(Settlement Agreement Draft at 3.)

Under these circumstances, the only reasonable conclusion Sony

could have reached was that the Niro Firm had the authority to bind

Thorner to the Settlement Agreement based upon Thorner's manifested

assent to the Niro Firm's conduct.  Accordingly, the Court finds

that Thorner's counsel the Niro Firm acted with the necessary

authority when Niro made a settlement offer that was accepted by

Sony.  Thus, the contract is enforceable against Thorner.

**B.    Motion for Sanctions**

Attorneys' fees and costs are not ordinarily recoverable and,

unless specifically authorized by statute, are awarded only in

extraordinary cases.  See Hobbs v. Am. Investors Mgmt., Inc., 576

F.2d 29, 35 n.18 (3d Cir. 1978) (citing Alyeska Pipeline Serv. Co.

v. Wilderness Soc'y, 421 U.S. 420 (1975)).  Exceptions to this

general rule are rooted in the inherent equity power of the courts

and include the power to award attorneys' fees when the losing

party has acted in bad faith, vexatiously, wantonly, or for

22

oppressive reasons.  See Walther & Cie v. U.S. Fid. & Guar. Co.,
397 F.Supp. 937, 946 (M.D.Pa. 1975) (citing F.D. Rich Co. Inc. v.
Indus. Lumber Co., Inc., 417 U.S. 116 (1974)); see also Belfer v.
Merling, 322 N.J.Super. 124, 144-45 (App.Div. 1999) ("When the
plaintiff's conduct bespeaks an honest attempt to press a
perceived, though ill-founded and perhaps misguided, claim, he or
she should not be found to have acted in bad faith," and the
plaintiff's actions will not justify a fee award unless made "for
the purpose of harassment, delay, or malicious injury.").

     In Walther, the request for an award of attorneys' fees was
denied.  397 F.Supp. at 946.  In addition to finding that the
defendants had not disobeyed a court order, the court in Walther
found that causing a plaintiff to seek enforcement of a settlement
agreement does not, by itself, amount to bad faith or vexatious,
wanton, or oppressive behavior.  Id.  Here, although Thorner
effectively delayed the enforcement of the Settlement Agreement,
Sony has not demonstrated that Thorner attempted to extort
additional settlement funds or engaged in other bad faith conduct.
(See dkt. entry no. 181-1, Defs. Br. in Supp. of the Mot. at 12-13;
Defs. Reply Br. at 13.)  Thus, this Court finds an award of
attorneys' fees and costs inappropriate and denies the part of the
motion seeking sanctions.

**CONCLUSION**

For the reasons stated supra, the Court will grant the part of defendants' motion for enforcement of a settlement agreement, deny the part of defendants' motion seeking sanctions, and deny the motion for recusal.  The Court will issue an appropriate Order.

                                                     <u>    s/ Mary L. Cooper       </u>

                                                     **MARY L. COOPER**
United States District Judge

Dated: March 18, 2013

24